IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

PHOENIX NEWSPAPERS, INC. and JOHN D'ANNA,
*Petitioners*,

*v.*

THE HONORABLE PETER C. REINSTEIN, Judge of the
SUPERIOR COURT OF THE STATE OF ARIZONA,
in and for the County of MARICOPA,
*Respondent Judge,*

STATE OF ARIZONA and GARY MICHAEL MORAN,
*Real Parties in Interest.*

No. 1 CA-SA 16-0096
FILED 8-11-2016

---

Petition for Special Action from the Superior Court in Maricopa County
No.  CR2014-128973-001
The Honorable Peter C. Reinstein, Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED**

---

COUNSEL

Ballard Spahr LLP, Phoenix
By David J. Bodney, Heather Todd Horrocks
*Counsel for Petitioners*

Maricopa County Public Defender's Office, Phoenix
By Angela L. Walker, Bobbi Falduto
*Counsel for Real Party in Interest Moran*

---

## OPINION

Judge Randall M. Howe delivered the opinion of the Court, in which Presiding Judge Diane M. Johnsen and Judge Andrew W. Gould joined.

---

**H O W E**, Judge:

**¶1**　　　Phoenix Newspapers, Inc. and John D'Anna (collectively, "PNI") seek special action relief from the trial court's order denying its motion to quash a subpoena duces tecum. PNI argues that because the affidavit accompanying the subpoena for D'Anna's interview notes did not satisfy Arizona's Media Subpoena Law, A.R.S. § 12–2214, PNI was not required to disclose the information to Gary Michael Moran, the real party in interest. Specifically, and as relevant to our disposition of this special action, PNI argues that Moran has not exhausted all available sources for the information and that the information is protected by Arizona's Media Shield Law, A.R.S. § 12–2237, and the First Amendment to the United States Constitution.

**¶2**　　　Special action jurisdiction is appropriate here because PNI has "no equally plain, speedy and adequate remedy by appeal," Ariz. R. P. Spec. Act. 1(a), and the issue raised is a purely legal question of statewide importance, *Matera v. Superior Court*, 170 Ariz. 446, 447, 825 P.2d 971, 972 (App. 1992). Moreover, special action review is appropriate because PNI has been ordered to disclose what it claims is privileged information. *See Azore, LLC v. Bassett*, 236 Ariz. 424, 426 ¶ 2, 341 P.3d 466, 468 (App. 2014). Consequently, we accept jurisdiction, and because Moran has not satisfied the Media Subpoena Law's requirements to compel disclosure by PNI, we grant relief and vacate the trial court's order.

## FACTS AND PROCEDURAL HISTORY

**¶3**　　　The State has charged Moran with first-degree murder of Fr. Kenneth Walker and aggravated assault against Fr. Joseph Terra, both on June 11, 2014. A year after the incident, on June 11, 2015, and also on December 25, 2015, D'Anna authored and *The Arizona Republic* published two articles about Fr. Terra and the incident. The first article detailed Fr. Terra's celebrating a Mass for Fr. Walker and the second detailed Fr. Terra's choice to forgive the assailant.

¶4        According to defense counsel's affidavit accompanying the subpoena, she contacted D'Anna on December 28, 2015, requesting "a copy of any notes taken during his interviews or meeting with Father Terra." D'Anna declined to provide any notes or to say whether any notes existed. Counsel subsequently subpoenaed D'Anna to appear in court and to produce, as relevant, "any and all electronic communications, written notes, audio, visual, or otherwise memorialized documentary evidence related to Father Joseph Terra's interview" concerning the articles.

¶5        In the same affidavit, counsel avowed, as relevant, that she had been unable to obtain the items either from D'Anna or his legal representative and that "[o]nly Mr. D'Anna [was] in possession of the information . . . , either memorialized in notes or merely remembered." Counsel also avowed that "[s]tatements about the offense, including but not limited to, what happened, the quality of Father Terra's memory, the extent of his injuries, his feelings about the events, and any other information about the offense [were] relevant and material to Mr. Moran's defense." Counsel further avowed that the notes sought were not protected by any lawful privilege and that the subpoena was not intended to interfere with rights protected by the First Amendment to the United States Constitution or Article 2, Section 6, of the Arizona Constitution.

¶6        PNI moved to quash the subpoena, arguing that the affidavit did not comply with the Media Subpoena Law. Under that statute, a party wishing to subpoena information from a member of the news media must provide an affidavit that, among other things, avows that the affiant has tried to obtain the information from all other available sources and that the information is not lawfully privileged. A.R.S. § 12–2214(A). PNI argued that these requirements were not met because Moran had not tried to interview Fr. Terra to obtain the information and because the notes were protected by the Media Shield Law, the First Amendment, and Article 2, Section 6.

¶7        Specifically, PNI argued that the affidavit could not overcome the privilege afforded to reporters by the Media Shield Law, which protects "the source of information procured or obtained by" a journalist. A.R.S. § 12–2237. PNI contended that the Media Shield Law protects not only a reporter's source but also the information a source gives a reporter in confidence. It argued that some of the information Fr. Terra disclosed to D'Anna was disclosed in confidence and therefore protected by the Media Shield Law. PNI further contended that the affidavit could not overcome the First Amendment's qualified journalist's privilege, which protects the identity of sources and a source's information from compelled disclosure unless the party seeking discovery shows that he has exhausted all

3

reasonable alternative sources to obtain the information and the information is noncumulative and actually relevant. *See Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*"). Moran responded that the affidavit complied with the Media Subpoena Law; that the Media Shield Law was inapplicable because it only protects sources, not information; and that he met the requirements for disclosure under the First Amendment.

**¶8** After briefing and oral argument, the trial court denied PNI's motion to quash. The court found that counsel's affidavit satisfied the Media Subpoena Law's requirements. Specifically, the court found that the affidavit provided all the information the statute required, and consequently, the affidavit was sufficient because under *Bartlett v. Superior Court*, 150 Ariz. 178, 722 P.2d 346 (App. 1986), the affidavit must be accepted in the absence of a controverting affidavit, which PNI did not provide. The court also found that the Media Shield Law did not apply because the subpoena did not require PNI "to reveal confidential sources or information," nor would it "impede the gathering of information."

**¶9** The court found that the First Amendment privilege was codified in the Media Shield Law and that it only applied to confidential sources. The court further found that even assuming that the First Amendment provided additional protection, it did not protect D'Anna's notes because Moran had proved that the information sought was unavailable after exhausting all alternative sources and that it was noncumulative and relevant to his defense. PNI moved for reconsideration and provided a controverting affidavit, but after considering briefing and the affidavit, the court denied the motion. The parties have stipulated to a stay of the disclosure order while PNI seeks special action relief.[1]

### DISCUSSION

**¶10** PNI argues that the trial court erred in denying the motion to quash. Specifically, PNI argues that the affidavit accompanying the subpoena duces tecum does not satisfy the Media Subpoena Law because (1) Moran has not exhausted all other available sources for the information and (2) the Media Shield Law and the First Amendment protect the information from disclosure. We review the trial court's denial of a motion to quash a subpoena duces tecum for an abuse of discretion. *Schwartz v. Superior Court*, 186 Ariz. 617, 619, 925 P.2d 1068, 1070 (App. 1996). But we

---

[1] Moran has requested to remove the State as a real party in interest from our caption. But because the State has an interest in the outcome of this litigation, we deny Moran's request.

review de novo whether and to what extent a privilege exists. *Carondelet Health Network v. Miller*, 221 Ariz. 614, 617 ¶ 8, 212 P.3d 952, 955 (App. 2009).

¶11 We also review de novo issues of law involving statutory interpretation. *Id.* Our primary goal in interpreting a statute is to give effect to legislative intent, looking to the plain language as the best indicator of that intent. *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 383 ¶ 8, 296 P.3d 42, 46 (2013). Privilege statutes are strictly construed, however, because "they impede the truth-finding function of the courts." *Carondelet Health*, 221 Ariz. at 616 ¶ 7, 212 P.3d at 954. As discussed below, the affidavit accompanying the subpoena duces tecum fails to satisfy two requirements of the Media Subpoena Law: that Moran has exhausted other sources for the information and that the information is not protected by any lawful privilege. Because Moran has not satisfied these requirements, we need not address PNI's other arguments. *See Freeport McMoran Corp. v. Langley Eden Farms, LLC*, 228 Ariz. 474, 478 ¶ 15, 268 P.3d 1131, 1135 (App. 2011) (declining to decide unnecessary issues or issue advisory opinions). Therefore, because the affidavit was deficient, the trial court erred in denying the motion to quash the subpoena duces tecum.

¶12 The Media Subpoena Law provides that subpoenas of persons "engaged in gathering, reporting, writing, editing, publishing, or broadcasting news to the public" shall have "no effect" unless accompanied by "the required affidavit." A.R.S. § 12–2214(A)–(B). The statute "protect[s] members of the media from burdensome subpoenas and broad discovery fishing expeditions that would interfere with the ongoing business of gathering and reporting news to the public." *Matera*, 170 Ariz. at 448, 825 P.2d at 973. The statute "was designed to aid a specified class of persons—members of the media—in performing their jobs free from the inconvenience of being used as surrogate investigators for private litigants." *Id.*

¶13 The "required affidavit" must meet six specific requirements. *See* A.R.S. § 12–2214(A). The affiant must (1) list "[e]ach item of documentary and evidentiary information sought from the person subpoenaed"; (2) avow that the affiant "has attempted to obtain each item of information from all other available sources, specifying which items the affiant has been unable to obtain"; and (3) identify "the other sources from which the affiant or his representative has attempted to obtain the information." A.R.S. § 12–2214(1)–(3). The affiant must also avow that (4) "the information sought is relevant and material to the affiant's cause of action or defense" and that (5) "the information is not protected by any lawful privilege." A.R.S. § 12–2214(A)(4)–(5). The affiant must finally avow

that (6) "the subpoena is not intended to interfere with the gathering, writing, editing, publishing, broadcasting and disseminating of news to the public as protected by" the First Amendment and Article 2, Section 6 of the Arizona Constitution. A.R.S. § 12–2214(6).

¶14        Once the party seeking the information has complied with the requirements of subpart (A), the subject of the subpoena may controvert the allegations of the affidavit and set forth the bases therefor by either filing a controverting affidavit or moving to quash the subpoena. A.R.S. § 12–2214(C); *see also Bartlett*, 150 Ariz. at 183, 722 P.2d at 351. "If the affidavit is controverted or a motion to quash the subpoena . . . is filed by the person subpoenaed, the command of the subpoena shall be postponed" until the trial court holds a hearing and issues an order. A.R.S. § 12–2214(C). Consequently, the subpoena has "no effect" until the movant establishes the six requirements in subpart (A). *See* A.R.S. § 12–2214(A)–(B). However, if the party subpoenaed contests the affidavit by filing a controverting affidavit or, as here, moves to quash the subpoena duces tecum, the trial court must stay the subpoena and hold a hearing to determine the merits of the motion to quash. *See* A.R.S. § 12–2214(C).

## 1. Exhaustion of Other Sources

¶15        PNI argues that the affidavit did not satisfy the Media Subpoena Law because Moran did not "attempt[] to obtain each item of information from all other available sources." *See* A.R.S. § 12–2214(A)(2). Counsel's affidavit stated that she had requested "any and all communication" between D'Anna and Fr. Terra in reference to the June 11 and the December 25 articles. Counsel avowed that she had "been unable to obtain [the items] from Mr. D'Anna and his legal representative." But counsel's affidavit stated that she was requesting information about communications between D'Anna *and* Fr. Terra. She said nothing about seeking the information directly from Fr. Terra; indeed, nothing in the record indicates that Moran made any effort to contact Fr. Terra to ask him for an interview. Moran has not exhausted the possibility that the priest could provide Moran with the same information that he provided PNI. Further, although the Victim's Bill of Rights gives Fr. Terra the right to refuse an interview with Moran, defense counsel, or any "other person acting on behalf of Defendant," Ariz. Const. art. II, § 2.1(A)(5), defense counsel's affidavit does not state whether an interview with Fr. Terra was requested or denied.

¶16        Moran counters that interviewing Fr. Terra now would not provide the same information as D'Anna's notes of his interviews with the

priest because only the notes would memorialize Fr. Terra's actual statements during the interviews. But this argument fails because Moran has not attempted to interview Fr. Terra; therefore, Moran has not eliminated the possibility that Fr. Terra would accurately recount his conversations with D'Anna. Consequently, because Moran has not exhausted the requirement of seeking the information "from all other available sources," the affidavit fails to satisfy a requirement of the Media Subpoena Law to compel PNI to disclose the information.

### 2. Protection by Lawful Privilege

**¶17** PNI next argues that the affidavit also cannot satisfy the Media Subpoena Law because the information Moran seeks is protected by the Media Shield Law and the "journalist's qualified privilege" afforded by the First Amendment. But Moran counters that the Media Shield Law "does not protect information derived from a non-confidential source." Moran also counters that he has met the First Amendment's requirements to compel disclosure because he has shown that "PNI is the only source of the subpoenaed information, the information is not cumulative, and the information is material and relevant to [his] case." As discussed below, the Media Shield Law is inapplicable, but because Moran has not made the necessary showings to overcome the First Amendment privilege, the affidavit fails to satisfy the Media Subpoena Law's requirement that the information sought is not subject to a privilege.

### 2(a). Arizona's Media Shield Law

**¶18** PNI first contends that Moran cannot satisfy the Media Subpoena Law's absence-of-privilege requirement because the Media Shield Law protects the information at issue. The Media Shield Law protects a journalist from being compelled to "testify or disclose in a legal proceeding or trial or any proceeding whatever . . . the source of information procured or obtained by him for publication in a newspaper or for broadcasting over a radio or television station with which he was associated or by which he is employed." A.R.S. § 12–2237. This statutory privilege protects a reporter's sources, *Matera*, 170 Ariz. at 449, 825 P.2d at 974, and the reporter holds the privilege, *Flores v. Cooper Tire & Rubber Co.*, 218 Ariz. 52, 58 ¶ 26, 178 P.3d 1176, 1182 (App. 2008). This privilege "is rooted in the public purpose to allow journalists to collect the news from sources who would not otherwise disclose information if they were identified." *Id.* at 59 ¶ 33, 178 P.3d at 1183. Because the statute applies to all proceedings "whatever," *see* A.R.S. § 12–2237, the statute precludes

"disclosure of the confidential source." *Flores*, 218 Ariz. at 60–61 ¶ 44, 178 P.3d at 1184–85 (internal quotation marks and citations omitted).

**¶19** PNI counters that the statute protects both sources and confidential information. But this issue has been previously decided in *State v. Moody*, 208 Ariz. 424, 94 P.3d 1119 (2004). In *Moody,* a criminal defendant argued that the trial court erred in preventing him from cross-examining a reporter who had written an article about the crimes he was accused of committing. *Id.* at 457 ¶ 134, 94 P.3d at 1152. Our supreme court held that the Media Shield Law did not protect the reporter from the defendant's cross-examination about "unpublished information" or the reporting process. *Id.* at 458 ¶¶ 136–39, 94 P.3d at 1153. The court explained that the statute was "not implicated in this case because [the] article did not involve a confidential source." *Id.* at ¶ 139; *see also Matera*, 170 Ariz. at 449, 825 P.2d at 974–75 ("The statute does not protect all the activities of would-be publishers or newsgatherers, nor does it protect any and all information gathered."). Consequently, the Media Shield Law is inapplicable because the subpoena does not seek the source of the information in D'Anna's articles; it seeks information Fr. Terra, an identified source, disclosed in his interviews with D'Anna. Because the subpoena did not seek disclosure of a confidential source, the Media Shield Law is inapplicable here.

### 2(b). The First Amendment

**¶20** PNI next argues that Moran also cannot satisfy the Media Subpoena Law's absence-of-privilege requirement because the information sought is protected by the journalist's qualified privilege afforded by the First Amendment.[2] The First Amendment provides, in relevant part, that "Congress shall make no law(s) . . . abridging the freedom of speech, or of the press." U.S. Const. amend. 1. As applicable here, the extent of a journalist's privilege under federal law derives from the First Amendment as established by *Branzburg v. Hayes*, 408 U.S. 665 (1972). In *Branzburg*, the United States Supreme Court considered whether a news reporter could be compelled to testify before a grand jury. The reporter had written an article about two drug dealers he had interviewed and had watched manufacture hashish. *Id.* at 667–68. The reporter declined to identify them before the

---

[2] PNI also contends that Article 2, Section 6 affords protection to D'Anna's information. *See* Ariz. Const. art. 2, § 6 ("Every person may freely speak, write, and publish on all subjects, being responsible for abuse of that right."). But because we resolve this issue on the narrow ground of the First Amendment, we need not reach the Arizona Constitution. *See Freeport McMoran*, 228 Ariz. at 478 ¶ 15, 268 P.3d at 1135.

grand jury, relying on a reporter's privilege under state law; the state trial court ordered him to answer the questions. *Id.* at 668. The *Branzburg* plurality rejected the privilege claim, citing the public's interest in effective law enforcement and the important role of grand juries. *Id.* at 690–91.

¶21　　　The plurality observed, however, that "news gathering is not without its First Amendment protections." *Id.* at 707. The plurality also found "merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards." *Id.* at 706. The plurality recognized that "state courts [may] . . . respond[] in their own way and constru[e] their own constitutions so as to recognize a news[person]'s privilege, either qualified or absolute." *Id.* Justice Powell, who cast the decisive concurring vote, suggested that the First Amendment requires a "case-by-case" balancing "between freedom of the press [not to disclose information] and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.* at 710.

¶22　　　In *Farr v. Pitchess*, 522 F.2d 464 (9th Cir. 1975), the Ninth Circuit Court of Appeals interpreted *Branzburg* to establish a qualified privilege for journalists. The Ninth Circuit considered the extent of protection afforded by the First Amendment's free press provision to a newspaper reporter who resisted judicially-ordered disclosure of his news sources. *Id.* at 466. In the midst of the Charles Manson and "Manson Family" murder trial, a reporter obtained from two separate sources two copies of a purported confession by Susan Atkins, a Manson co-defendant, as a third party documented in a written statement. *Id.* The trial court learned about the reporter's possession of the confession and ordered the reporter to disclose his sources. *Id.* The reporter refused and ultimately was held in contempt of court for refusing to name his confidential sources. *Id.*

¶23　　　The Ninth Circuit recognized that *Branzburg* dealt precisely with the First Amendment's free press provision as it affected testimony sought to be produced before a grand jury; however, it concluded that "the opinion appears to teach broadly enough to be applied to other civil or criminal judicial proceedings as well." *Id.* at 467. The court observed that "[i]t [was] clear that *Branzburg* recognize[d] some First Amendment protection of news sources," which was a qualified, not absolute, "First Amendment shield" that protects journalists against compelled disclosure in all judicial proceedings. *Id.*

¶24　　　In *Shoen I*, and subsequently *Shoen II*, the Ninth Circuit once again opined on the journalist's privilege and recognized that eight of the other nine circuit courts that had addressed the issue read *Branzburg* as

establishing a qualified privilege for journalists. *Shoen v. Shoen*, 5 F.3d 1289, 1292–93 & n.5 (9th Cir. 1993) ("*Shoen I*"); *Shoen II*, 48 F.3d at 416. The Ninth Circuit opined that "[r]ooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public, is an interest of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Shoen I*, 5 F.3d at 1292 (internal quotation marks and citation omitted).

¶25 Although not binding, the Ninth Circuit's reasoning in *Farr*, *Shoen I*, and *Shoen II* is persuasive. *See Skydive Ariz., Inc. v. Hogue*, 238 Ariz. 357, 365 ¶ 29, 360 P.3d 153, 161 (App. 2015) (providing that decisions of the Ninth Circuit and other federal circuit courts are not binding, but persuasive authority to which Arizona courts may look). Consequently, under the First Amendment, journalists enjoy a constitutional qualified privilege against compelled disclosure of information gathered in the course of their work.[3] *Shoen II*, 48 F.3d at 414, 416. Because the "privilege is qualified, not absolute," "the process of deciding whether the privilege is overcome requires that the claimed First Amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts, and a balance struck to determine where lies the paramount interest." *Shoen I*, 5 F.3d at 1292–93. The privilege "applies to a journalist's resource materials even in the absence of the element of confidentiality." *Id.* at 1295. "[T]he absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure." *Id.*

¶26 Once the reporter invokes the privilege, "the burden shifts to the requesting party to demonstrate a sufficiently compelling need for the

---

[3] Although the trial court found that the Media Shield Law "codified" the First Amendment protection, the statute provides independent protection from the qualified privilege afforded to journalists by the First Amendment's free press provision. After recognizing that the First Amendment provided journalists protection for their news sources, the *Branzburg* plurality invited state legislatures to "fashion their own standards" and "constru[e] their own constitutions so as to recognize a [reporter's] privilege." *See* 408 U.S. at 706. The Arizona Legislature enacted the Media Shield Law *before Branzburg* invited states to fashion their own standards. Thus, this statutory protection was created independent of the First Amendment protection as interpreted by *Branzburg* and its progeny.

journalist's material." *Id.* at 1296. That is, "[t]o overcome a valid assertion of the journalist's privilege by a nonparty, a civil litigant seeking information that is not confidential must show that the material is: (1) unavailable after exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case."[4] *Shoen II*, 48 F.3d at 418. Moreover, the litigant "must . . . show[] actual relevance; a showing of potential relevance will not suffice." *Id.* at 416.

¶27     Here, Moran has not met his burden of demonstrating a "sufficiently compelling need for the journalist's material." *Shoen I*, 5 F.3d at 1296. First, as discussed above, *see supra* at ¶¶ 15–16, Moran has not shown that he has exhausted all reasonable alternative sources for the information contained in D'Anna's notes. Second, Moran has made no showing that the information he seeks does not duplicate information he already possesses; specifically, the information in the two published articles, the police interview with Fr. Terra, and Fr. Terra's recorded 911 call. Finally, Moran has not shown how D'Anna's notes are *actually relevant* to his case. *See Shoen II*, 48 F.3d at 416 ("[T]here must be a showing of actual relevance; a showing of potential relevance will not suffice."). He merely declares that the notes are necessary as impeachment evidence and for "mitigation in this capital case."

---

[4]     The *Shoen II* test applies when non-confidential information is sought. In its petition, PNI asserts that Fr. Terra requested during one of his interviews that some information he relayed to D'Anna be treated as confidential and not for publication and that D'Anna agreed. Some courts have held that when confidential information is sought from a journalist, the First Amendment may require a more protective weighing. *See Gonzales v. Nat'l Broadcasting Co., Inc.*, 194 F.3d 29, 34 (2d Cir. 1998) ("[W]e now hold that, while nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought."); *Goldberg v. Amgen, Inc.*, 123 Fed. Supp. 3d 9, 17 (D.D.C. 2015) ("Consequently, the showing needed to overcome a reporter's privilege when the information sought is nonconfidential is less demanding than the showing required where confidential materials are sought."); *see also United States v. Cutler,* 6 F.3d 67, 71 (2d Cir. 1993) (stating that when a party seeks confidential material, "disclosure may be ordered only upon a *clear and specific showing* that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources") (emphasis added).

¶28 The trial court erred by finding that Moran met his burden of overcoming D'Anna's reporter's privilege. At a minimum, Moran cannot overcome the reporter's privilege without showing that he is unable to interview Fr. Terra or that, having interviewed Fr. Terra, he still lacks an alternative means of obtaining the information. If Moran is able to make such a showing, the trial court may order an *in camera* review of the notes to determine whether they contain actually relevant and noncumulative information. The court may conduct the *in camera* review itself; alternatively, it may have another judge conduct the review or appoint a special master to do so. *See State v. Boggs*, 218 Ariz. 325, 331, 337 ¶¶ 17, 53, 185 P.3d 111, 117, 123 (2008) (finding that a capital defendant's constitutional rights were protected when a special master appointed for the purpose of reviewing the items for relevance reviewed the seized materials and returned any privileged documents to the defendant). In sum, Moran has not met his burden of overcoming the privilege the First Amendment affords to PNI. Consequently, because the affidavit was defective, the trial court erred in denying the motion to quash the subpoena.

## CONCLUSION

¶29 For the foregoing reasons, we accept jurisdiction, grant relief, and vacate the trial court's order.



Ruth A. Willingham · Clerk of the Court
FILED: AA